IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **CONCORD ENERGY LLC,** § | |
| § | |
| **Plaintiff**, § | |
| § | |
| v. § | |
| § | **CASE NO: 4:21-cv-00328** |
| **HELLERVIK OILFIELD** § | |
| **TECHNOLOGIES LLC**, § | |
| § | |
| **Defendant.** § | |
| § | |

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Concord Energy LLC ("Concord"), by and through its undersigned counsel, sets forth its Amended Complaint against Defendant Hellervik Oilfield Technologies LLC ("Hellervik"), as follows:

### SUMMARY OF THE ACTION

1. Concord brings this action due to Hellervik's repeated and serious failures to fulfill the promises it made in a contract between the parties—failures that have directly resulted in significant damages to Concord and that threaten to diminish Concord's hard-earned reputation and good will with its customers.

2. In a contract dated April 9, 2019 (the "Agreement"), Hellervik agreed to construct a fractionation facility ("Fractionation Plant") where it would take in raw natural gas liquids ("Raw Make") provided by Concord and produce—through a process known as fractionation—purified natural gas products such as propane, butane, and ethane, among others ("Purity Products") that Concord would then transport and sell. This contractual arrangement had the potential to be very

lucrative for Hellervik so long as it could fulfill its obligations to (a) have the Fractionation Plant operational by July 1, 2019, and (b) operate the Fractionation Plant appropriately so that the Purity Products would meet standard industry quality specifications such that they could be sold to the market.

3. Unfortunately for both parties, Hellervik fell severely short on both counts. Hellervik failed to have the Fractionation Plant operational (producing and loading Purity Products) until October 2020—more than a year later than the Agreement specified. And even after finally beginning operations, Hellervik repeatedly produced Purity Products that deviated from standard industry quality specifications, creating a nightmare scenario in which Concord had to ship product back to Hellervik for reprocessing, find replacement products for its customers from other sources, and pay to replace customers' equipment that was damaged by using Hellervik's off-spec products.

4. Despite these severe disruptions and failures, Concord did its best to salvage the situation, allow Hellervik time to improve its operations to the point where it finally began producing appropriate products, and provide Hellervik an opportunity to mitigate its breaches of the Agreement through temporary offsets to the fees charged by Hellervik to Concord. Instead of collaborating with Concord in such a common-sense solution, Hellervik unilaterally terminated the Agreement on January 29, 2021 so that it could seek more lucrative arrangements for its now-operational Fractionation Plant while leaving Concord holding the bag of damages left behind due to Hellervik's delays and missteps. Not only that, but Hellervik has now locked Concord out of the Fractionation Plant, making it impossible to retrieve over 100,000 gallons of product belonging to Concord that Hellervik now apparently intends to keep for itself.

5. In this suit, Concord seeks to vindicate its contractual rights and obtain damages to compensate Concord at least in part for the grave harm Hellervik has caused.

## PARTIES

6. Concord is a Colorado limited liability company with citizenship in Colorado, Texas, and Canada.

7. Hellervik is Delaware limited liability company with its principal place of business in North Dakota.  Upon information and belief, Hellervik has two individual members Lowell Hellervik, a citizen of Minnesota, and Gary Minard, a citizen of North Dakota.

## JURISDICTION AND VENUE

8. The Court has original subject matter jurisdiction of this civil action under 28 U.S.C. § 1332(a).  This Court has diversity jurisdiction over all claims as complete diversity exists between the parties and the amount in controversy exceeds $75,000.00.

9. Jurisdiction and venue are proper in this judicial district because Hellervik agreed, in the Agreement, that any action between it and Concord would be brought exclusively in a federal or state court in Houston, Texas, and Hellervik irrevocably consented to jurisdiction of and venue in this Court.

## SUBSTANTIVE ALLEGATIONS

**The Parties Entered Into a Contract Requiring Hellervik to Build and Operate a Fractionation Plant.**

10. In 2019, Concord and Hellervik entered into and executed the Agreement, dated April 9, 2019.  The Agreement is attached as an Exhibit to this Amended Complaint and is incorporated herein.

3

11.     The Agreement identifies a site in Ray, North Dakota where Hellervik was (at the time) constructing the Fractionation Plant. The Agreement specifies that the following "facilities will be installed and operational by no later than July 1, 2019:"

> An approximately 80,000 gallon per day fractionation plant which Hellervik shall expand to be able to fractionate 120,000 gallons per day. The Fractionation [Plant] will include, a de-ethanizer column, a de-propanizer column with reboiler, a de-butanizer column with reboiler, storage tank supports, hot oil heater, treating equipment, separation and fractionation vessels, and associated condensing, heating, pumping, conveying, and other equipment and instrumentation; including all structures associated with those facilities; and all Purity Products loading facilities, including loading facilities for offloading to Concord.

12.     The Agreement also obligated Hellervik to "install a minimum 300,000 gallons of storage capacity on the Site for Purity Products" and further required that "[t]ruck filling times will be commensurate with best industry practices so as not to delay trucks inordinately while loading Purity Products."

13.     Under the Agreement, Hellervik committed to "fractionate all of Concord's Raw Make into Purity Products, up to the capacity of the Fractionation [Plant] on an exclusive basis." Additionally, Hellervik committed to "store the Purity Products fractionated from Concord's Raw Make up to the storage capacity at the Site on an exclusive basis."

14.     The Agreement also provided that "Hellervik shall deliver to and load the Purity Products fractionated from Concord's Raw Make to the Product Delivery Points in accordance with the terms of this Agreement and accommodating Concord's requirements to deliver Purity Products."

15.     To ensure the marketability of the products coming out of the Fractionation Plant, the Agreement provided that "[a]ll Purity Products made by Hellervik shall meet standard industry

4

quality specifications," and "in all respects meet the latest Gas Processors Association specifications for that Product[.]"

16. In consideration for building the Fractionation Plant and providing fractionation services to Concord, the Agreement calls for Concord to pay Hellervik 12 cents per gallon of Raw Make fractionated by Hellervik.

17. The Agreement specifies a term of five years from the date of execution, while giving each party "the right at the end of year two of the agreement and each yearly anniversary date of the agreement thereafter, to elect not to continue the agreement, if market conditions makes it uneconomical to continue the agreement for the ensuing year."

18. The Agreement also incorporates certain terms and conditions that are attached as an exhibit to the Agreement (the "Additional Terms"). The Additional Terms include the obligation for Hellervik to "odorize all shipments of Propane in accordance with standard industry practice." The Additional Terms also provide that, "in the event either party fails to make timely delivery of Produce due and owing to the other party, the other party may offset any deliveries or payments due under a Contract…."

**Hellervik Failed to Operationalize the Fractionation Plant On Time.**

19. Despite the obligation to have the Fractionation Plant operational by July 1, 2019, Hellervik did not reach operational status (producing and loading Purity Products) until October 2020—a full year later than required under the Agreement.

20. This delay caused Concord enormous harm. In particular, Concord, relying on Hellervik's promise to have an operational Fractionation Plant by July 2019 and its various subsequent representations throughout 2019 and 2020 that the plant would soon be operational,

5

entered into contracts with other parties to purchase Raw Make that Concord planned to transport to the Hellervik Fractionation Plant for processing and then sale.

21. Hellervik knew that Concord was making such contractual arrangements to purchase Raw Make for processing at the Fractionation Plant.

22. When Hellervik failed to meet its timing commitment to have an operational Fractionation Plant, Concord had to transport the Raw Make it was obligated to purchase to other plants for fractionation on terms that, with the additional transportation and handling costs, resulted in an overall loss of hundreds of thousands of dollars.

**Hellervik Failed to Ensure the Fractionation Plant Met the Agreed Specifications.**

23. Even though Hellervik finally operationalized the Fractionation Plant in October 2020, it never completed construction to meet all of the specifications called for in the Agreement.

24. For example, the Agreement requires Hellervik to "install a minimum of 300,000 gallons of storage capacity on the Site for Purity Products…." Upon information and belief, Hellervik's Fractionation Plant to this day has a storage capacity of only approximately 232,000 gallons.

25. Additionally, Hellervik constructed the Fractionation Plant and attempted to operate it without many equipment items that are standard in the industry for fractionation facilities and that are critical for efficient and consistent production of Purity Products that meet the industry standard specifications.

26. Hellervik's failure to meet the facility specifications has resulted in Concord being unable to process as much Raw Make at the Fractionation Plant as had been contemplated based on the terms of the Agreement.

**Hellervik Failed to Produce Purity Products Meeting Industry Standards.**

27. The long delay in opening the Fractionation Plant unfortunately was just the beginning of the problems caused by Hellervik.

28. In particular, in the ensuing months, the Purity Products produced by Hellervik failed to consistently meet standard industry specifications, including the latest Gas Processors Association specifications, as required by the Agreement. In some instances, the Purity Products significantly deviated from standard industry specifications, making them unusable and unmarketable, and requiring re-transportation and re-processing.

29. For example, a December analysis of Purity Product produced by Hellervik revealed a propane content of only 51-56%--far less than the industry standard minimum of 90% for marketable liquid propane.

30. Even when Hellervik has managed to achieve 90% propane, the remaining 10% in the propane product has often contained volumes of butane greater than the industry standard of 3% and natural gasoline greater than the industry standard of 0.5%.

31. These struggles to meet industry standard specifications occurred intermittently from October 2020 through January 2021. Many additional analyses of samples of Purity Product produced by Hellervik during this time period revealed product that failed to meet industry standards.

32. In many instances, Hellervik offloaded the defective product to Concord trucks without informing Concord that the product was off-spec.

33. Hellervik's failure to produce product meeting industry standard specifications caused major disruptions to Concord's marketing and sale of Purity Products.

34. Among other things, Concord was forced to retrieve defective product and return it to the Fractionation Plant for reprocessing, obtain and provide to customers replacement product from other sources, and pay for equipment repairs and replacement when downstream customers' use of Hellervik's product resulted in equipment failures.

35. Additionally, Hellervik's failure to produce acceptable Purity Products significantly harmed Concord's reputation and good will with its downstream customers.

**Hellervik Agreed to Mitigation Measures Before Rejecting Them and Giving Notice of Termination.**

36. Despite the many instances in which Hellervik failed to meet its obligations under the Agreement, Concord worked with Hellervik in good faith in an effort to preserve the working relationship, improve Hellervik's performance at the plant, and mitigate the damages directly caused by Hellervik's breaches.

37. For instance, during the summer of 2020 when Hellervik was finally on the cusp of beginning operations at the Fractionation Plant, Concord representative Kyle McKinnell negotiated with Hellervik representative Lowell Hellervik a new fee structure providing for a reduced fractionation fee during a temporary period of time so that Concord could recover some of the losses directly caused by Hellervik's delay in opening.

38. Mr. Hellervik agreed orally to the updated temporary fee structure, which Mr. McKinnell then confirmed in writing.

39. As Hellervik's struggles continued after beginning operations, Concord worked with Hellervik in the remainder of 2020 and the beginning of 2021 to further extend the timing of the temporary fee structure so that both parties could obtain the benefits bargained for in the Agreement despite Hellervik's delays and continuing problems.

40. During this time period, Hellervik accepted, without objection, payments from Concord that were expressly calculated based on the reduced fee structure agreed to by the parties.

41. Additionally, Concord worked with Hellervik to put in place quality control measures to increase the consistency of the quality of the Purity Products produced by Hellervik.

42. Despite these good faith efforts intended to salvage the fractionation arrangement between the parties and mitigate the damages caused by Hellervik, on January 29, 2021, Hellervik gave notice to Concord that it was unilaterally terminating the Agreement, effective immediately.

43. Upon information and belief, Hellervik is now refusing to accept and fractionate Raw Make from Concord.

44. In its termination notice, Hellervik falsely contended that Concord unilaterally imposed a reduced fractionation fee in violation of the Agreement. In reality, Hellervik expressly agreed to the temporary reduced fee structure and for many months abided by it without objection.

45. Although the parties did not formalize the reduced fee structure as an amendment to the Agreement, the parties agreed to the arrangement as a way of offsetting the damages caused by Hellervik's failures.

46. Far from being a breach of the Agreement, Concord's use of the temporary reduced fee structure has been done with Hellervik's consent and is consistent with the parties' obligations under the Agreement. Indeed, the Additional Terms of the Agreement provide that Concord could offset payments due in the event Hellervik failed to make timely delivery of the Purity Products.

47. Concord has fulfilled all its obligations under the Agreement. As such, Hellervik has no basis to terminate the Agreement.

48. Additionally, in its notice of termination, Hellervik asserted that it would, in any event, terminate the Agreement at the two-year anniversary because "market conditions make it uneconomical to continue the agreement beyond the expiration of the initial two-year period, which will expire on April 8, 2021."

49. Hellervik did not explain what market conditions have made it uneconomical to continue the Agreement.

50. In fact, market conditions have not made it uneconomical to continue the Agreement, and Hellervik has no basis to exercise termination at the two-year anniversary.

51. Hellervik's premature termination of the Agreement is yet another breach of the Agreement and has caused immediate and ongoing harm to Concord. Among other things, Concord will now have to make other arrangements for the processing of Raw Make that would otherwise have been processed at the Fractionation Plant and will incur additional costs and losses in doing so.

**After Terminating, Hellervik Stole Concord's Raw Make and Purity Products.**

52. On the day Hellervik gave notice of its purported termination of the Agreement, Concord instructed one of its trucking providers to retrieve Concord's Raw Make and Purity Products that were still stored at the Fractionation Plant. The trucking provider contacted Hellervik to schedule the loading and removal of these products but was told by a Hellervik employee that Hellervik would not load Concord's remaining products.

53. On the same day, another truck arrived at the Fractionation Plant to load Purity Products for Concord. Hellervik personnel refused to load the products.

54. Upon information and belief, Hellervik has instructed its personnel to prevent Concord's shipping trucks from entering the Fractionation Plant and removing the Raw Make and Purity Products.

55. Hellervik continues to intentionally deprive Concord of its Raw Make and Purity Products by exercising its dominion and control over Concord's property.

56. Over 100,000 gallons of Raw Make and Purity Products belonging to Concord remain at the Fractionation Plant.

57. Concord continues to suffer economic damages because of Hellervik's actions.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

58. Concord incorporates by reference herein the allegations in paragraphs 1 through 57 above.

59. Concord and Hellervik entered into the Agreement pursuant to which Hellervik agreed to timely construct and operationalize the Fractionation Plant and ensure it met agreed specifications, and produce Purity Products meeting industry standards, among other things.

60. The Agreement was a valid contract between Concord and Hellervik.

61. Concord fulfilled all its commitments under the Agreement, including paying Hellervik a fractionation fee for the fractionation of Raw Make into Purity Products.

62. Hellervik breached its obligations under the Agreement by, among other things, failing to timely construct and operationalize the Fractionation Plant, failing to ensure the Fractionation Plant met agreed upon specifications, failing to produce Purity Products meeting industry standards, and unilaterally terminating the Agreement without justification.

63. Concord has incurred various costs and expenses, including attorneys' fees, prior to and leading up to the filing of the instant action, in an attempt to mitigate the damages caused by Hellervik's breaches.

64. Concord has suffered and will continue to sustain actual damages, in an amount to be determined at trial.

65. All conditions precedent to Concord's right to bring and maintain this claim have occurred.

## SECOND CLAIM FOR RELIEF
### (Promissory Estoppel)

66. Concord incorporates by reference herein the allegations in paragraphs 1 through 57 above.

67. After Hellervik's repeated failures to meet its obligations under the Agreement, Concord worked with Hellervik in good faith to attempt to preserve the contractual relationship and mitigate the damages directly caused by Hellervik's breaches.

68. Hellervik, through Mr. Hellervik, promised and agreed to charge Concord a reduced fractionation fee for a temporary period of time so that Concord could recover some of the losses directly caused by Hellervik's delay in opening and operational problems.

69. Hellervik knew that Concord would rely on Hellervik's promise to charge a temporary reduced fractionation fee by continuing to purchase and transport Raw Make to Hellervik for fractionation rather than seek other arrangements.

70. Concord actually and substantially relied on Hellervik's promise by continuing to purchase and send Raw Make to the Fractionation Plant and paying Hellervik to produce Purity

Products, rather than terminating the Agreement in light of Hellervik's breaches or otherwise seeking other arrangements.

71. Concord's reliance on Hellervik's promise was reasonable because it arose out of Hellervik and Concord's mutual realization that both parties could obtain the benefits they had bargained for if they cooperated in improving the fractionation operations and using future proceeds to offset Concord's damages.

72. Unless Hellervik's promise to charge Concord a temporary reduced fractionation fee is enforced, Concord will suffer an injustice that is otherwise not avoidable.

### THIRD CLAIM FOR RELIEF
### (Conversion)

73. Concord incorporates by reference herein the allegations in paragraphs 1 through 57 above.

74. Concord owns over 100,000 gallons of Raw Make and Purity Products that are currently stored in or otherwise reside at the Hellervik Fractionation Plant.

75. Concord has demanded return of the Raw Make and Purity Products.

76. Hellervik has refused, and continues to refuse, to allow Concord to remove the Raw Make and Purity Products from the Fractionation Plant.

77. Hellervik continues to assume and exercise dominion and control over Concord's Raw Make and Purity Products located at the Fractionation Plant without a legal basis or authorization to do so.

78. As a result, Concord continues to sustain damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (In the alternative, Unjust Enrichment)

79. Concord incorporates by reference herein the allegations in paragraphs 1 through 57 above.

80. As a result of the actions described above, Hellervik obtained benefits from Concord in the form of a significant volume of Raw Make and Purity Products stored at the Fractionation Plant.

81. Hellervik retained these benefits at Concord's expense.

82. Hellervik received these benefits without justification and under circumstances that would make it unjust for Hellervik to retain these benefits.

83. Concord is entitled to restitution for the benefit Hellervik received by exercising control over the Raw Make and Purity Products.

## ADDITIONAL CLAIMS FOR RELIEF

84. Concord reserves the right to add additional claims for relief after discovery.

## PRAYER FOR RELIEF

**WHEREFORE**, Concord respectfully requests that this Court grant relief against Hellervik in Concord's favor as follows:

A. For money damages in an amount to be determined;

B. For the costs and expenses, including reasonable attorneys' fees, incurred by Concord in connection with this action;

C. Pre- and post-judgment interests;

D. Equitable relief allowable under law; and

E. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Concord hereby demands a trial to jury on all issues so triable.

Dated:  March 31, 2021                                        Respectfully submitted,

*/s/ Mark Champoux*
Mark Champoux (*Pro Hac Vice*)
CO Bar No. 40480
Kyler K. Burgi, *Attorney in Charge*
CO Bar No.: 46479
S.D. Tex. Bar No.: 3542748
Philip D. Nickerson
CO Bar No. 54318
S.D. Tex Bar No.: 3633282
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202
Telephone: 303-892-9400
Facsimile: 303-893-1379
Email: kyler.burgi@dgslaw.com
            mark.champoux@dgslaw.com
            philip.nickerson@dgslaw.com

*Attorneys for Plaintiff Concord Energy LLC*

**CERTIFICATE OF SERVICE**

  I hereby certify that on March 31, 2021, a true and correct copy of the above was filed and served via email through the Southern District of Texas's CM/ECF Notice of Electronic Filing System.

                    *s/ Mark Champoux*