# EXHIBIT A

# HELLERVIK OILFIELD TECHNOLOGIES LLC – CONCORD ENERGY, INC. FRACTIONATION, STORAGE AND LOADING AGREEMENT

This Fractionation, Storage and Loading Agreement ("Agreement") is made and entered into this _9TH_ day of _APRIL_ , 2019, by and between **Hellervik Oilfield Technologies LLC** ("Hellervik"), and **Concord Energy LLC** ("Concord"). Hellervik and Concord may be referred to individually as "Party", or collectively as "Parties".

Section 1.     **Scope of Agreement and General Terms and Conditions.** Concord desires to deliver Raw Make, as defined below, to Hellervik, and Hellervik agrees to receive and fractionate that Raw Make into Purity Products, as defined below, and to store, load and deliver Purity Products to Concord, or for Concord's account, all in accordance with this Agreement.  This Agreement incorporates and is subject to all of the General Terms and Conditions attached hereto, together with any other Exhibits attached hereto.

Section 2.     **Term.**  This Agreement shall remain in full force and effect from the date of execution for a period of five years with an option to extend any number of additional years at the mutual agreement of the parties in writing. Each party shall have the right at the end of year two of the agreement and each yearly anniversary date of the agreement thereafter, to elect not to continue the agreement, if market conditions makes it uneconomical to continue the agreement for the ensuing year. The parties may also agree to make adjustments in writing to the Fractionation Fee described in Section 4 of this Agreement.

Section 3.     **Facilities and Services.**  Hellervik agrees to provide the following facilities and services for the exclusive fractionation of Concord's Raw Make:

A. Hellervik has leased a 30-acre, more or less, site south of Ray, North Dakota in Williams County, located near the intersection of 117th Ave NW and 62 St NW (the "**Site**"). Hellervik is constructing and installing the following on the Site (collectively, the "**Fractionation Facility**").  Such facilities will be installed and operational by no later than July 1, 2019:

> i.     An approximately 80,000 gallon per day fractionation plant which Hellervik shall expand to be able to fractionate 120,000 gallons per day. The Fractionation Facility will include, a de-ethanizer column, a de-propanizer column with reboiler, a de-butanizer column with reboiler, storage tank supports, hot oil heater, treating equipment, separation and fractionation vessels, and associated condensing, heating, pumping, conveying, and other equipment and instrumentation; including all structures associated with those facilities; and all Purity Products loading facilities, including truck loading facilities for offloading to Concord.

Case 4:21-cv-00135   Document 20-1   Filed on 02/22/21 in TXSD   Page 2 of 9

1

ii.     Hellervik shall install a minimum 300,000 gallons of storage capacity on the Site for Purity Products, consisting of appropriately sized bullet tank pressure vessels for offloading onto Concord trucks.  Truck filling times will be commensurate with best industry practice so as not to delay trucks inordinately while loading Purity Products.

iii.     Hellervik shall apply for and obtain North Dakota Air Quality and North Dakota Industrial Commission permits as required for the installation and operation of the Fractionation Facility.

B.     Hellervik shall fractionate all of Concord's Raw Make into Purity Products, up to the capacity of the Fractionation Facility on an exclusive basis.

C.     Hellervik will store the Purity Products fractionated from Concord's Raw Make up to the storage capacity at the Site on an exclusive basis.

D.     Hellervik shall deliver and load the Purity Products fractionated from Concord's Raw Make to the Product Delivery Points in accordance with the terms of this Agreement and accommodating Concord's requirements to deliver Purity Products.

E.     All Purity Products made by Hellervik shall meet standard industry quality specifications.

Section 4.     **Fees and Consideration.**

A. As full consideration for the services provided by Hellervik, Concord shall pay the following fees and provide the following:

i.     For the fractionation of Raw Make into Purity Products, by Hellervik, at the Fractionation Facility, Concord shall pay Hellervik a Fractionation Fee equal to the gallons of Raw Make fractionated multiplied by $0.12. The Fractionation Fee covers and is inclusive of Hellervik's costs for fractionating Raw Make, loading Purity Products and storage of Purity Products.

ii.  Hellervik shall have the right to reject ethane from the Raw Mix and use the rejected ethane as fuel for Hellervik's heater.  Concord and Hellervik shall cooperate in determining the volume of ethane to be contained in the Raw Make delivered by Concord for efficiency in fueling Hellervik's heater. Any Fractionation Fuel required beyond the rejected ethane shall be obtained by Hellervik at its cost.

Section 5.     **Notices.**  All notices, statements, invoices or other communications required or permitted between the Parties shall be in writing and shall be considered as having been given if delivered by mail, courier, hand delivery, email or facsimile to the

Case 4:21-cv-00028  Document 16-1  Filed on 03/31/21 in TXSD  Page 3 of 9

2

other Party at the designated address, email address or facsimile numbers. Normal operating instructions can be delivered by telephone or other agreed means. Notice of events of Force Majeure may be made by telephone and confirmed in writing within a reasonable time after the telephonic notice. Monthly statements, invoices, payments and other communications shall be deemed delivered when actually received. Either Party may change its address or facsimile and telephone numbers upon written notice to the other Party:

Concord:

Address:  Concord Energy LLC
1401 17th St #1500
Denver, CO 80202

Hellervik:

Address:  Hellervik Oilfield Technologies LLC
401 E Broadway Ave, Suite 200
Bismarck, ND 58501

Section 6.  **Execution.**  This Agreement may be executed in any number of counterparts, each of which shall be considered an original, and all of which shall be considered one instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first set forth above.

Hellervik Oilfield Technologies          Concord Energy LLC

By: _Gary Minard_                         By: _____
Name:  GARY MINARD                        Name: Stephen Tsai
Title:  GENERAL MANAGER                    Title:  manager          KM

3

Chevron Products Company, a division of Chevron U.S.A. Inc.
General Terms and Conditions for Liquids Product Purchases and Sales Agreements
Dated September 01, 2006


EXHIBIT A

1) **DEFINITIONS**

"Affiliate" means an entity controlling, controlled by or under common control with either party.

"API" means the American Petroleum Institute.

"Buyer" means the Buyer of Product as specified in the Contract.

"Contract" means the Contract to which these terms and conditions are incorporated.

"Liquid Product" means liquid hydrocarbons.

"Plant Sale" refers to a sale or purchase identified in the Contract with a specified transaction location at a processing plant, fractionator or refinery.

"Product" means either the Liquid Product or the Raw Product as specified in the Contract.

"Raw Product" or "Y Grade" means non-segregated mixture of natural gas liquids.

"Seller" means the Seller of Product as specified in the Contract.

2) **REPRESENTATIONS AND WARRANTIES**

a) Seller represents and warrants to Buyer that: (i) Seller has title to the Product delivered hereunder or the right to deliver same, and **SELLER AGREES TO INDEMNIFY, DEFEND AND HOLD BUYER HARMLESS FROM AND AGAINST ANY LOSS, CLAIM OR DEMAND BY REASON OF ANY FAILURE OF SUCH TITLE OR RIGHT OR BREACH OF THIS WARRANTY**; and (ii) Product delivered hereunder shall be delivered in full compliance with all federal and state laws, rules and regulations and orders that may be applicable thereto, subject to the provisions of Section 4.

b) Buyer represents and warrants to Seller that: (i) Buyer is sophisticated and knowledgeable of (a) the hazards and risks associated with the Product delivered hereunder, and (b) the handling, receipt, transportation, storage and use of such Product; and (ii) Product received hereunder shall be received in full compliance with all applicable federal and state laws, rules and regulations and orders that may be applicable thereto.

c) **EXCEPT AS EXPRESSLY SET FORTH IN THE CONTRACT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO THE PRODUCT OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EVEN IF SUCH PURPOSE IS KNOWN TO THE PARTIES.**

3) **DELIVERY**

a) Unless otherwise specified in a Contract, title to and risk of loss or damage of any Product shall pass to Buyer when delivery is completed as specified herein.

b) When delivery is point of origin, delivery shall be completed: (i) to ships or barges when the Product has passed the vessel's loading flange; (ii) to tank cars when the carrier accepts the Product for shipment; (iii) to pipelines when the Product has passed the downstream flange of the meter measuring the Product for delivery; or (iv) to tank trucks when the Product has passed Seller's loading equipment for open hatch deliveries and when the Product enters the tank truck's loading equipment for all other deliveries.

c) When delivery is point of destination, delivery shall be deemed to have been completed: (i) from ships or barges when the Product has passed the vessel's discharge flange; (ii) from tank cars when the carrier delivers the Product at the destination; (iii) from pipelines when the Product has passed the upstream flange of the meter measuring the Product for delivery; or (iv) from tank trucks when the Product has passed the tank truck's delivery equipment.

d) When delivery is in-line, in-well or by Product transfer order, delivery shall be deemed to have been completed upon execution of the order by the pipeline carrier and/or storage operator.

e) Seller's tank rail cars must be unloaded and returned to railroad within five (5) days. Demurrage charges at destination will be borne by Buyer on a pro rata daily basis and at rates as advised by Seller from time to time. Seller's tank rail cars and transport trucks will not be diverted except with written consent from Seller.

f) After completion of delivery of Product by Seller, Seller shall not be liable to Buyer for reductions in quantity or degradations of quality of such Product in the custody of Buyer or Buyer's designee. Buyer agrees that, after delivery, the handling, care or use of Product shall be at Buyer's sole risk and expense.

4) **ODORIZATION.** Unless otherwise provided, Seller shall odorize all shipments of Propane in accordance with standard industry practice (currently 1.5 pounds of ethyl mercaptan per 10,000 gallons), or as required by governmental agencies having proper jurisdiction. Unless otherwise provided, no loads of Propane delivered to Buyer or its designee shall leave the processing plant, refinery, fractionator or terminal unodorized. Seller shall have no further responsibility to monitor the Propane or to take any other action after delivery thereof to Buyer to ensure that said Propane remains properly odorized after delivery to the Buyer. Buyer will either monitor and maintain the odorant at or above proper levels as required by law or notify its buyer(s) of the odorant fade risk. If unodorized Propane is to be delivered hereunder, then Buyer represents and warrants to Seller that Buyer will not use such Propane for fuel or knowingly resell it for fuel without adding an odorizing agent in accordance with standard industry practice or as required by governmental agencies having proper jurisdiction.

5) **QUANTITY AND MEASUREMENT**

a) The quantity(ies) of Product(s) sold and purchased under the Contract are set forth on the Contract.

b) The measurement of all liquid Product volumes shipped or transported in bulk will be in accordance with API, GPA and/or other accepted industry measurement standards for such Product and will be corrected to a temperature of 60 F by use of the Volume Correction/Reduction Tables applicable to that Product as published by API, GPA and/or other accepted industry standard and in effect on the date of shipment. Quantities of Product delivered will be determined at the delivery point by a mutually acceptable metering system or weight scale, whenever possible. Product measured volumetrically at pressure above equilibrium vapor pressure must also include compressibility factor corrections.

c) In the event of a Plant Sale, Seller reserves the right to make processing elections pursuant to the terms and conditions of its gas processing agreements with the gas processing plants, or refining and manufacturing elections within the refinery or with respect to the crude oil run within the refinery, and such elections could affect the Product volumes available at one or more of the delivery points in the Contract for Buyer. The volumes of Product available for Buyer to purchase from Seller will be subject not only to Seller's gas processing and refining elections, but also to Force Majeure events, operating conditions, production variances, pipeline operational flow orders, fluctuating economic conditions of the marketplace, and various other factors that may be out of Seller's reasonable control.

d) In the event of a Plant Sale, Seller agrees to provide to Buyer an estimate of projected Product volumes flowing through each location listed on the Contract on or before two (2) days prior to the beginning of each month of sale. It is fully understood that notwithstanding such estimates, inventory levels at the locations may change which may also affect the Product volumes available for sale.

e) If specified on a Contract, the volume of Raw Product produced at a processing plant or refinery that is purchased by Buyer from Seller in a Plant Sale shall be determined based on measurement utilized at the RP Measurement Point identified in the Contract. Seller and Buyer shall have the right to witness all such measurements, tests and determinations. If an RP Measurement Point is not identified in the Contract, the volume of Raw Product purchased by Buyer from Seller in a Plant Sale shall be determined by the gas processing plant statements, fractionator statements and/or refinery statements at the identified Delivery Point.

6) **PRICE.** The price for Product sold and purchased under a Contract shall be the price described in the Contract, and may vary due to location, fractionation services or loadout limitations. Fuel surcharges, if applicable, will be in addition to the prices included on the Contract. Published pipeline tariff changes will cause corresponding changes to the price specified on the Contract.

7) **CLAIMS. SELLER SHALL HAVE NO LIABILITY TO BUYER FOR ANY DEFECT IN QUALITY OR SHORTAGE IN QUANTITY OF PRODUCT SOLD AND DELIVERED HEREUNDER UNLESS BUYER GIVES SELLER NOTICE OF BUYER'S CLAIM BY EMAIL OR FACSIMILE AND SELLER IS GIVEN AN OPPORTUNITY TO INSPECT THE PRODUCT IN QUESTION PRIOR TO UNLOADING, OR IN CASE OF ANY LATENT DEFECT IN QUALITY, BUYER GIVES SELLER NOTICE THEREOF WITHIN SEVEN (7) DAYS AFTER BUYER'S DISCOVERY OF SUCH DEFECT. SELLER SHALL HAVE NO LIABILITY FOR ANY DEFECT IN ANY PRODUCT WHICH HAS BEEN COMMINGLED IN ANY WAY WITH A SIMILAR PRODUCT OBTAINED ELSEWHERE OR WITH A DIFFERENT PRODUCT, REGARDLESS OF WHERE OBTAINED. EVERY NOTICE OF CLAIM FOR DEFECT IN QUALITY OR QUANTITY SHALL SET FORTH FULLY THE FACTS UPON WHICH THE CLAIM IS BASED. IT IS AGREED THAT ANY CLAIM ASSERTED BY BUYER UNDER THIS SECTION 7 BASED UPON OR ARISING OUT OF AN ALLEGED DEFECT IN QUALITY OR QUANTITY OF THE PRODUCT SHALL BE BARRED UNLESS ASSERTED BY BUYER BY THE COMMENCEMENT OF AN ACTION WITHIN TWELVE (12) MONTHS AFTER THE DELIVERY OF THE PRODUCT OR OTHER EVENT, ACTION OR INACTION TO WHICH SUCH CLAIM RELATES. BUYER'S EXCLUSIVE REMEDY FOR ANY AND ALL CLAIMS FOR DEFECT IN QUALITY OR QUANTITY OF PRODUCT UNDER THIS SECTION 7 SHALL BE LIMITED AT SELLER'S OPTION TO EITHER THE REFUND OF THE PURCHASE PRICE OR THE REPLACEMENT OF THE PARTICULAR PRODUCT UPON WHICH A CLAIM IS PROVED. IN NO EVENT SHALL SELLER BE LIABLE TO BUYER FOR ANY PROSPECTIVE PROFITS OR SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT ARISING OUT OF NEGLIGENCE.**

8) **QUALITY.** Delivered Product shall in all respects meet the latest Gas Processors Association ("GPA") specifications for that Product and contain no deleterious substances or concentrations of any contaminants that may make it or its components commercially unacceptable in general industry practice. Buyer shall have the right to accept or reject deliveries of offspec Product. All volumes of Propane which do not meet GPA standards for HD-5 Propane shall be settled at a price to be negotiated by the parties; however, propane delivered in the State of California must meet the minimum refinery grade specification for commercial grade propane rather than GPA standards for HD-5 Propane.

9) **INSPECTION**

a) If Buyer has reason to believe that Product does not meet the quality specifications under the Contract, the parties shall collect a Product sample and submit same to a mutually agreeable independent laboratory for analysis. The results obtained by the independent laboratory shall be conclusive. Costs for the sampling and testing shall be borne equally by Seller and Buyer.

b) Either Buyer or Seller may secure third party inspectors to perform gauging, sampling, and testing of the Product, subject to any safety or other requirements of the owner/operator of the processing plant and/or fractionator. Unless otherwise agreed to in writing, such gauging, sampling (if not performed pursuant to Section 9(a) hereinabove), and testing shall be at the sole expense of the requesting party.

10) **INVOICES AND TERMS OF PAYMENT**

a) Seller will provide to Buyer an invoice for the current month's estimated production by no later than the 30th day of the month following the production month. Differences, if any, between estimated production volumes and the delivered volumes (determined in accordance with Sections 5) shall be resolved on a cash basis and reflected in the subsequent month's invoice. Seller shall provide to Buyer a final invoice for each month's purchases with all taxes as provided in Section 19 as applicable. Payment is due to Seller within ten (10) days from receipt of invoice and supporting documentation, and shall be made to Seller's designated account via wire transfer, electronic funds transfer or other mutually agreed payment method.

b) If payment is not made within the specified time, Seller, at its sole election and in its sole discretion, may: (i) recover its reasonable costs of collection, institution of any suit or advice or service incident to the breach of any other condition of this Contract by Buyer and on account of bankruptcy proceedings by or against Buyer, including attorney's fees; (ii) collect interest for late payments from the due date to date of payment at the lesser of (a) the prime rate of interest published in the Wall Street Journal, from time to time, plus five percent (5%), or (b) the maximum non-usurious interest rate which may be charged pursuant to applicable Texas law, Article 5069-1.04 Texas Rev. Civ. Stat. as amended; (iii) suspend deliveries until Buyer has paid in full for all Product delivered; (iv) require Buyer to pay cash at the time of delivery or provide such other collateral security as Seller in its discretion may specify; and/or (v) terminate this Contract or any portion hereof immediately and without notice.

c)   Seller's exercise of any rights reserved under this Section shall be without prejudice to any claim for damages or other rights or remedies available to it under this Contract or applicable law.

11)  **FINANCIAL RESPONSIBILITY.**  If the financial responsibility of the owing party becomes impaired or unsatisfactory to the other party, then in any such case advance cash payment, properly endorsed negotiable bills of lading or satisfactory security shall be given upon demand, and performance hereunder may be withheld until such payment, bills of lading or security is received.  If such payment, bills of lading or security is not received within fifteen (15) days from demand therefor, the demanding party may terminate the Contract.  In the event either party makes an assignment for the benefit of creditors or any general arrangement with creditors, or if there are instituted by or against either party proceedings in bankruptcy or under any insolvency law or law for reorganization, receivership or dissolution, the other party may withhold shipments and deliveries or terminate the Contract without notice.  In the event either party fails to make a timely payment of monies due and owing to the other party, or in the event either party fails to make timely delivery of Product due and owing to the other party, the other party may offset any deliveries or payments due under a Contract or under any other agreement between the parties and their affiliates.  The exercise by either party of any right under this paragraph shall be without prejudice to any claim for damages or any other right under a Contract or applicable law.

12)  **FORCE MAJEURE.**  If either party is rendered unable, wholly or in part, to perform its obligations under this Contract (other than to make payments due hereunder) due to force majeure, defined herein as any cause or causes beyond the control of the party affected (including but not limited to fire; explosion; riots; strikes; labor disputes; breakdown of machinery; compliance voluntary or involuntary with any law, order, rule, regulation, recommendation, or request, whether valid or invalid, of any government or international agency or authority or person purporting to act thereunder; shortage, allocation or failure of the usual means of transportation of Product or supplies; partial or total failures of shortages in supply, or inability for any reason to obtain supplies; or inability for any reason to obtain materials to be used in the manufacture of Product), then upon the affected party giving prompt notice and full particulars of such force majeure to the other party, the obligations of the affected party shall be suspended for the duration of such inability to perform, and such cause shall so far as possible be remedied with all reasonable dispatch.  Notwithstanding the foregoing, it is understood and agreed that the settlement of strikes or lockouts shall be entirely within the discretion of the party having the difficulty.  The above requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of the opposing party when such course is inadvisable in the discretion of the party having the difficulty.

13)  **INDEMNITIES AND LIABILITY**

a)   SELLER AGREES, TO THE FULLEST EXTENT PERMITTED BY LAW AND REGARDLESS OF THE PRESENCE OR ABSENCE OF INSURANCE, TO DEFEND, INDEMNIFY AND HOLD BUYER, ITS AFFILIATES, AND ALL OF ITS AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, BORROWED SERVANTS AND AGENTS (THE "BUYER INDEMNITEES") HARMLESS FROM ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, COSTS AND EXPENSES (INCLUDING COURT COSTS, ANY COST OR EXPENSE OF INCIDENT INVESTIGATION AND REASONABLE ATTORNEY'S FEES), OR ANY LIABILITY ARISING FROM OR ON ACCOUNT OF INJURY, DEATH OR DAMAGE WHICH OCCURS BEFORE DELIVERY OF PRODUCT TO BUYER OR ITS AGENTS UNDER THIS CONTRACT AND/OR ARISE IN CONNECTION WITH SELLER'S OR ITS REPRESENTATIVE'S OR AGENT'S LOADING, TRANSPORTATION, STORAGE, OR HANDLING OF PRODUCT COVERED BY THIS CONTRACT; PROVIDED, HOWEVER, SELLER'S INDEMNITY OBLIGATION SHALL NOT APPLY TO THE EXTENT THAT SUCH INJURIES OR DAMAGES ARE CAUSED BY THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY BUYER INDEMNITEE.

b)   BUYER AGREES, TO THE FULLEST EXTENT PERMITTED BY LAW AND REGARDLESS OF THE PRESENCE OR ABSENCE OF INSURANCE, TO DEFEND, INDEMNIFY AND HOLD SELLER, ITS AFFILIATES, AND ALL OF ITS AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, BORROWED SERVANTS AND AGENTS (THE "SELLER INDEMNITEES") HARMLESS FROM ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, COSTS AND EXPENSES (INCLUDING COURT COSTS, ANY COST OR EXPENSE OF INCIDENT INVESTIGATION AND REASONABLE ATTORNEY'S FEES), OR ANY LIABILITY ARISING FROM OR ON ACCOUNT OF INJURY, DEATH OR DAMAGE WHICH OCCURS AFTER DELIVERY OF PRODUCT TO BUYER OR ITS AGENTS UNDER THIS CONTRACT AND/OR ARISE IN CONNECTION WITH BUYER'S OR ITS REPRESENTATIVE'S OR AGENT'S LOADING, TRANSPORTATION, STORAGE, OR HANDLING OF PRODUCT COVERED BY THIS CONTRACT; PROVIDED, HOWEVER, BUYER'S INDEMNITY OBLIGATION SHALL NOT APPLY TO THE EXTENT THAT SUCH INJURIES OR DAMAGES ARE CAUSED BY THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY SELLER INDEMNITEE.

14)  **INSURANCE.**  Unless Buyer is self-insured and has provided Seller evidence of such self-insurance reasonably acceptable to Seller, Buyer agrees to procure and maintain or cause its agents, contractors and their subcontractors, and representative to procure and maintain insurance coverage.  Such insurance shall be in compliance with the requirements of the law of the state in which delivery of the Product will occur with respect to the receipt of Product hereunder and/or activities related thereto.  Buyer acknowledges and agrees that Seller shall not insure Buyer's products, servants and/or property, not the Product(s), property and/or servants of others in connection with this Contract.  Insurance required by the above provision, if any, and deductibles associated therewith shall be carried and paid, as applicable by Buyer at its own expense.

15)  **CONFLICT OF INTEREST.**  Except as otherwise expressly, provided herein, no director, employee or agent of either party, its subcontractors or vendors, shall give or receive from any director, employee or agent of the other party or any affiliate, any commission, fee, rebate, gift or entertainment of significant cost or value in connection with this Contract.  In addition, no director, employee, or agent of either party, its subcontractors or vendors, shall enter into any business arrangement with any director, employee, or agent of the other party or any affiliate who is not acting as a representative of such party or its affiliate without prior written notification thereof.  Any representative(s) authorized by either party may audit the applicable records of the last three years of the other party for the sole purpose of determining whether there has been compliance with this paragraph.

16)  **ASSIGNMENT.**  This Contract shall extend to and be binding upon the parties hereto, their successors and assigns, but it is expressly agreed that neither party shall assign this Contract without the prior written consent of the other party, which consent shall not be unreasonably withheld, provided however, either party shall have the right to assign this Contract to any of its Affiliates without necessity of obtaining the other party's consent thereto.  Should either party assign this Contract to any of its Affiliates, notice will be given to the other party within thirty (30) days.  In the event of assignment of this Contract, the assignee shall be required, at a minimum, to meet the terms and conditions set forth in Sections 11 and 14 of this Contract.

17)  **NOTICE.**  Any notice hereunder shall be in writing and shall be delivered personally, by mail, or by facsimile to the party's address set forth in the Contract, unless changed by notice and shall be deemed to have been given on the date of the delivery thereof to the party receiving such notice.

18) **AUDIT.** Each party and its duly authorized representatives shall have access to the accounting records and other documents maintained by the other party which relate to the measurement, composition or handling of the Product being delivered under this Contract. Each party shall have the right to audit such records once a year at any reasonable time or times within twenty-four (24) months of the rendition of any statement or invoice forming the basis of such claim. Neither party shall make claim on the other for any adjustment after said twenty-four month period.

19) **TAXES.** Seller assumes liability for, and must pay, all taxes assessed on or in connection with production, extraction, processing (excluding odorization), manufacture or transport (excluding taxes and fees imposed upon the removal from a plant, terminal or wharf) of Product prior to delivery to the Delivery Point, (including, without limitation, assuring that severance taxes, royalties, working interest payments and similar burdens imposed with relation to extraction and production of same are borne by Seller or prior suppliers of same). Any personal property or similar ad valorem taxes levied or assessed by any governmental authority upon ownership of the Product subject to any Contract must be paid by the Party having title thereto at the time of such assessment. Other than such taxes and fees as are allocated under this Section above, the Buyer assumes liability, and must pay or reimburse Seller in addition to the Contract Price, for all other taxes, fees, charges or any other exactions, now or hereinafter enacted, levied or assessed by any federal, state, local or other governmental authority upon or as a result of any transactions and Product which are the subject matter of this Contract, including all new taxes or increases in existing taxes (but excluding the other Party's net income, gross margin, excess profits or corporate franchise taxes) imposed by any governmental authority upon the sale, use, delivery or receipt of the Product. If either Party is exempt from the payment of any taxes allocated to such Party under the foregoing provisions, such Party must furnish the other Party hereto proper exemption documentation. **EACH PARTY AGREES TO INDEMNIFY AND HOLD THE OTHER PARTY HARMLESS FROM AND AGAINST ALL CLAIMS, CAUSES OF ACTION, PROCEEDINGS, JUDGMENTS, INTEREST, PENALTIES, FEES OR OTHER LIABILITIES BROUGHT BY OR AWARDED TO THIRD PARTIES ARISING OUT OF OR CONNECTED WITH TAXES TO BE PAID BY SUCH PARTY PURSUANT TO THIS SECTION.** Said indemnity includes the payment of attorney's fees and expenses incurred in defense of said claims, proceedings or causes of action. The Parties agree to cooperate with each other in defending non-taxable transaction of the Product pursuant to the Agreement if a Party is audited by or on behalf of a taxing jurisdiction for ad valorem, sales, use, excise, or similar taxes.

20) **LIMITATION OF LIABILITY.** NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR INDIRECT, INCIDENTAL, PUNITIVE, EXEMPLARY, CONSEQUENTIAL OR SPECIAL DAMAGES.

21) **ALLOCATION.** In case of partial or total interruption or loss or shortage of transportation facilities or supplies, or shortage of Products deliverable hereunder, Seller may allocate the available Products to any party if Seller does not have sufficient supplies of Products to meet the full requirements of Buyer, Seller, its subsidiaries and affiliated companies or any of Seller's other customers. Seller may allocate its available supplies of Products on any basis which in Seller's sole judgment is fair and reasonable, including, but not limited to, an allocation based on historical or planned deliveries. The shortage creating the need to allocate may be based on any of the following: an actual shortage of Products; a partial or total interruption or loss or shortage of transportation facilities or supplies; a shortage in a contemplated source of supply; or a general shortage in Seller's supply system (including the supply system of Seller's Affiliates). Seller shall have no obligation to make up any shortage resulting from a fair and reasonable allocation.

22) **MARINE PROVISIONS.** In the event delivery of Product(s) hereunder is to be accomplished by waterborne transportation, the provisions set out in the "Marine Provisions" attached hereto are made a part hereof, including International Ship and Port Facility Security ("ISPS") Code Provisions.

23) **BRAND NAMES.** Unless otherwise specifically agreed to by the parties in writing, Buyer shall not represent, or authorize or permit any other person to represent, that Product delivered hereunder is the Product of Seller. All Product delivered hereunder shall be used or sold under Buyer's brand names or the brand names of its purchasers, it being understood and agreed that nothing herein shall be construed to permit Buyer or its purchasers to use Seller's name or any brand name it may have in connection with the sale of any Product purchased hereunder.

24) **CONDUCT OF PARTIES' BUSINESS.** Each party in the performance of a Contract is engaged in an independent business, and nothing herein contained shall be construed as giving either party any right to control the other party in any way in the performance of the other party's business. Neither party shall have any right to exercise control over any of the other party's employees, representatives, agents or contractors of any level except to the extent of any safety requirements for delivery of Product under a Contract.

25) **GOVERNING LAW; JURISDICTION.** Contracts shall be subject to the jurisdiction of, governed by, and construed in accordance with the laws of the State of Texas without regard to those laws that would reference the laws of another jurisdiction. Any legal action or proceedings against a party with respect to any Contract shall be brought exclusively in a federal or state court located in Houston, Texas; and by acceptance of the Contract, the parties irrevocably accept for themselves and in respect of their property, generally, irrevocably and unconditionally, submit to the jurisdiction of these courts.

26) **CONFIDENTIALITY.** Each party shall hold as confidential any information concerning the terms of the Contract.

27) **SEVERABILITY.** The invalidity of any one or more covenants or provisions of a Contract shall not affect the validity of any other provision hereof or of any Contract as a whole. In case of any such invalidity, the Contract shall be construed to the maximum extent possible as if such invalid provision had not been included herein.

28) **NO THIRD PARTY BENEFICIARY.** Except as expressly set forth in a Contract, nothing in a Contract or these General Terms and Conditions shall entitle any persons other than Seller or Buyer or their successors or assigns, to any claim, cause of action, remedy or right of any kind relating to the transaction(s) contemplated herein.

29) **WAIVER.** Waiver by either party of the breach of any provision(s) hereof by the other party shall not be deemed to be a waiver of the breach of any other provision(s) hereof or of any subsequent or continuing breach of such provision(s).

30) **ALTERATIONS.** A Contract shall contain the entire agreement of the parties respecting the matters addressed therein, and no oral promises, agreements or warranties shall be deemed a part thereof. Nor shall any alteration or amendment of a Contract or waiver of any of its provisions be binding upon either party hereto unless the same is in writing and signed by the party to be charged.

31) **CONSTRUCTION OF AMBIGUITY.** The parties acknowledge and agree that the terms and conditions of the Contract were freely negotiated and drafted by the parties. The parties expressly agree that: in the event of any ambiguity in any of the terms and conditions of a Contract (including any Contracts, Attachments, Exhibits or Schedules thereto whether or not placed of record), such ambiguity shall not be construed for or against any party hereto on the basis that such party did or did not author the same.

32) **HEADINGS.** The headings of the Articles, Sections and Paragraphs of these General Terms and Conditions are for convenience of reference only and shall not constitute a part nor modify, define or limit any of the terms of provisions hereof.

33) **TEXAS DECEPTIVE TRADE PRACTICES (CONSUMER PROTECTION) ACT.** The parties certify that they are not "consumers" within the meaning of the Texas Deceptive Trade Practices (Consumer Protection) Act, Subchapter E of Chapter 17, Sections 17.41, <u>et seq.</u>, of the Texas Business and Commerce Code, as amended ("DTPA"). The parties covenant for themselves and for an on behalf of any successor or assignee that if the DTPA is applicable to a Contract: (1) the parties are "business consumers" as that term is defined in the DTPA; (2) OTHER THAN SECTION 17.555 OF THE TEXAS BUSINESS AND COMMERCE CODE, EACH PARTY HEREBY **WAIVES AND RELEASES ALL OF ITS RIGHTS AND REMEDIES THEREUNDER AS APPLICABLE TO THE OTHER PARTY AND ITS SUCCESSORS AND ASSIGNS**; and (3) **EACH PARTY SHALL DEFEND AND INDEMNIFY THE OTHER PARTY FROM AND AGAINST ANY AND ALL CLAIMS OF OR BY THE INDEMNIFYING PARTY OR ANY OF ITS SUCCESSORS AND ASSIGNS OR ANY OF ITS OR THEIR AFFILIATES OR SUBSIDIARIES BASED IN WHOLE OR IN PART ON THE DTPA AND ARISING OUT OF OR IN CONNECTION WITH A CONTRACT.**

34) **NO BROKER'S FEES/CONFLICTS.** Neither party has retained any brokers, agents or finders and none are affiliated with either party or authorized to act on behalf of either party in this matter. **EACH PARTY AGREES TO INDEMNIFY AND HOLD THE OTHER HARMLESS FROM AND AGAINST ANY CLAIMS OR WITH RESPECT TO ANY COMMISSIONS, FINDERS' FEES, OR OTHER REMUNERATION DUE TO ANY BROKER, AGENT, OR FINDER CLAIMING BY, THROUGH OR UNDER SUCH PARTY.**

35) **SAFETY.** Each party agrees that its agents and employees shall comply with all safety regulations of the other when such agents and employees are upon the premises of the other in connection with the performance of the Contract.

36) **ELECTRONIC RECORDING.** The parties agree that each party may electronically record all telephone conversations between their employees with respect to potential transactions and Contracts related to Products, without any special or further notice to the other party. Each party shall obtain any necessary consent of its agents and employees to such recording.